Argued 3 January, decided 30 January, rehearing denied 15 May, 1905.

## SWEETLAND v. GRANTS PASS POWER CO.

79 Pac. 337.

EASEMENT—CONSTRUCTION OF GRANT.

1. A grant to a power company and its successors and assigns forever of the right to go on land on the bank of a river and construct an abutment for a dam, and to keep the same in repair, is a grant of an easement in fee, appurtenant to the grantee's plant and the realty on which it was situated, so as to pass to its successors, in view of the fact that at the time it was made the grantee was constructing on the opposite side of the river a plant to be operated by water power, and was constructing a dam for that purpose, to the knowledge of the grantor.

RECORD NOTICE—INSTRUMENT ENTITLED TO RECORD.

2. A deed granting an easement in fee is entitled to record, and, being recorded, is notice to subsequent grantees of the servient estate.

EASEMENT—TRANSFER OF AS AN APPURTENANCE.

3. An easement appurtenant, as, for example, the right to construct on a stated tract abutments for a dam, passes under a grant of the dominant estate without being specially mentioned.

EASEMENT NOT A PUBLIC FRANCHISE.

4. A grant by a private citizen of an easement on his property is not a public franchise or privilege, though it is used in connection with and as part of the means of rendering such a privilege useful.

CONDUCT CONSTITUTING AN ESTOPPEL.

5. The grantor of an easement who has acquiesced in a change of the point of use of the right granted, on the strength of which the grantee has expended appreciable sums of money, cannot afterward object to the making of repairs at the new point of use.

OVERFLOWING LAND—CONSTRUCTION OF GRANT.

6. A grant of the right to construct on land an abutment for a dam, "together with the * * right * * and privilege forever to flow the waters of said * * river back upon and over the said land of the (grantor) at * * all times as a result and in consequence of said dam * * without any claim * * for damages" by the grantor, "his heirs or assigns," is sufficiently broad to prevent an action by the grantor or his successor in title for overflowing the land.

From Josephine: HIERO K. HANNA, Judge.

This is a suit by W. I. Sweetland against the Grants Pass New Water, Light & Power Co. to require the removal of a dam

and for damages. Plaintiff appeals from a decree against him.
                                                    Affirmed.

For appellant there was a brief and an oral argument by *Mr. William C. Hale.*

For respondent there was a brief and an oral argument by *Mr. William Torbert Muir.*

Mr. Chief Justice Wolverton delivered the opinion.

Shortly prior to September 24, 1889, The Grants Pass Water, Light & Power Co. was incorporated and organized, and, in pursuance of its purposes, it very soon acquired from the Town of Grants Pass the franchise, right, and privilege of laying within its streets water and gas mains, and of erecting and maintaining therein electric light poles, and affixing thereto the necessary attachments and wires for supplying the town and its inhabitants with water and light for public and domestic use. In furtherance of its purposes, on the date mentioned, it obtained from Fred Geyer, who was then the owner of lots 5 and 6, of section 19, township 36 south, of range 5 west of the Willamette Meridian, as designated upon the government survey, and abutting upon the south bank of Rogue River, a deed, whereby, in consideration of $50 and other advantages, he granted and confirmed unto the power company and its successors and assigns forever, viz:

"The full, free right, liberty and privilege to go upon and over such lands * * on the south bank of Rogue River opposite the Town of Grants Pass * * and there locate an abutment for a dam and to make the necessary excavations and to construct such abutment for a dam across said Rogue River, and to construct upon such land the necessary cribs and guards to such dam, and such abutments, and to construct said dam with such abutment on said land, and the right to forever repair, rebuild and maintain said dam, abutment, and cribs or guards on such land, and also the full, free right, liberty, and privilege of ingress and regress over and upon said bank and lands to construct, repair, rebuild and maintain said dam, abutments, and cribs or guards thereon, together with the full, free right, liberty and privilege forever to flow the waters of said Rogue River back upon and over the said land of the party of the first part any and all times as a result and in consequence of said dam across said river without any damages or claim or demand for damages upon the part of the

party of the first part, his heirs, or assigns, by reason of said abutment, cribs, guards, or dam, or of the flowing of the water over or upon any of the lands of the said party of the first part."

This deed was recorded in the record of deeds for Josephine County the day following. At the time of acquiring the grant, the power company was engaged in constructing a power house on the north bank of the river, and was, as stated by Boyington, the owner of the land upon which it was being built. It was also engaged in the construction of a dam running practically at right angles to the thread of the stream to the opposite bank, and it was for the purpose of securing the right of attaching the dam to the south bank, and so maintaining it, that the deed was obtained. It should be noted, also, as is shown by the testimony, that the dam was being built in connection with the power house as a means of utilizing the water in Rogue River as a source of power, in furtherance of the purposes for which the company was incorporated.

Soon after procuring the deed the dam was attached by an abutment at the south bank and completed. It remained in place, however, but a short time; and another was built slightly below, but with the bank abutments practically the same, which structure, and the water of Rogue River controlled by it, were utilized in connection with the power house. A year or so later the water carried away the south bank of the river, making a new channel around the abutment on that side. About 1893 or 1894 a new dam was constructed by extending a wing dam from the north approach of the old structure upstream some 700 feet, more or less, and connecting it with the south bank of the stream by crib-work at a point on the north margin of the plaintiff's premises, described in his complaint as containing 4.64 acres, which is perhaps, 1,300 feet above the original conjunction of said dam with such south bank. When this latter dam was built, and made to abut upon the present premises of plaintiff, Geyer was still the sole owner thereof, and especially of the 4.64-acre tract. He was cognizant of its construction, and it does not appear that he ever made any objection to abutting it upon his land at a different place from that where first attached. He was upon the stand for

plaintiff in the present case, and, if it had been so constructed without his consent or against his protest, undoubtedly the fact would have been developed. It does appear, however, that after the water washed around the south abutment, as first constructed, he consulted his lawyers, with a view to a recovery of damages, and was advised that he was without remedy, whereupon he testifies that he "gave up all, * * and I never said anything more about it." On August 26, 1897, Geyer contracted to convey the 4.64-acre tract to H. A. Corliss, and on June 5, 1899, conveyed to plaintiff and one Gray; they having succeeded to the interest of Corliss. Later, on June 13, 1901, Gray conveyed his interest to plaintiff; and, on the 14th of November following, plaintiff acquired the 1¾-acre tract adjoining on the west, and abounding on the river.

This indicates the chain of title to plaintiff's premises, and, in the mean while, acquaints us with the persons interested along the south bank of the river. In about 1900 it became necessary to repair this latter dam, and it was in a manner reconstructed, concerning which plaintiff testifies that he never gave any consent to such reconstruction, and further that he objected thereto and to its further maintenance; but his more explicit declarations are that he objected to the manner of raising the water, and more so to the ill-advised way in which the company was protecting the bank. It is further shown that in the winter and spring of 1901-02 the river washed around the south abutment of the latter dam and carried away some of the improvements of plaintiff, and much of the surface of the soil, with the trees and shrubbery, covering about one acre in extent, resulting in much damage to the property. In the summer, however, after the institution of the present proceedings, the defendant constructed a pier still further inland upon plaintiff's premises, and extended the dam to a connection with it. Concerning this added structure the plaintiff was interrogated and answered as follows:

"Q. Did you make any objection at that time to any of the persons in charge, against going upon your land with further construction?

A. No; I didn't at that time.

Q. You may state to the court why you didn't, Mr. Sweetland.

A. Well, the reason why I didn't, I thought it would be no advantage to me or them either to leave it the way it was, and I knew my objection would be no good, because I had objected before—a verbal objection. I didn't go any further. I didn't use any force or anything of that kind. They never asked for any privilege, either, to build out there. They just went ahead and built it, the same as they always did. * *

Q. They proceeded with the work there without asking your consent?

A. Yes, sir; there never was any talk in regard to that that I had at all, that I remember of. * *

Q. What did you say to Mr. Brown about repairing that dam?

A. Well, I met him there one day. I don't know how it happened.

Q. Where?

A. At the dam there on this south side. And I told him, if he was going ahead and put that in there in the shape it was, he was going to wash me out, and I tried to get him to protect that bank there. He told me there was no use protecting that bank; those willows stood there, and firs and alders, and there was no danger of washing that out; all he was looking for was to get water; let the bank take care of itself; and he told me it was none of my business, anyhow, or something to that effect.

Q. What else did you say to him?

A. I don't know. We talked a good many times. I don't know what I said. That was one time, I remember, that I protested, and that was the answer I got. I talked with Clarke since.

Q. Your conversation there was that you wanted him to protect that bank?

A. Yes; if he put in the dam, I could not stop him. They were working there with a crew of men. I didn't try to stop it. That was all I could do.

Q. You didn't talk about stopping the dam construction, but about protecting the bank?

A. About raising the dam. I didn't go down and tell him he could not put it in. I wasn't going to try to stop him, because I knew I couldn't.

Q. You merely spoke to Brown about protecting your land?

A. If he was going to raise the dam, I protested against him raising the dam without protecting me. I did that.

Q. Did you suggest how it should be protected?.

A. I don't remember.

Q. Didn't you tell him some rock should be put in, or something?

A. I made some suggestions. I don't remember what I said at that time.

Q. Were the suggestions you made at that time complied with?

A. No, sir.

Q. Didn't they do what you suggested should be done?

A. No, sir. They done what they suggested should be done.

Q. Do you remember what you suggested?

A. I might have suggested, and part of it might have been fulfilled, but all of it never was at any one time.

Q. When they were building that present pier you spoke of last year, did you object to that?

A. No, sir.

Q. You were perfectly willing for them to spend that money?

A. Yes, sir.

Q. You allowed them to do it?

A. Yes, sir; they never asked me. They never asked me about any of their business, and I had no objection to make to them.

Q. You wanted that done?

A. I wasn't particular about it.

Q. I thought you said in direct examination that you wanted that done?

A. I wasn't anxious to have just that much done; no. I wanted that done, and toeing put in to protect that land there, which wasn't done. * * Another thing I wanted done—I wanted toeing put in above that landing. I told Clarke about it—gave him my idea of it—so it would keep the water from going around. I told him what I thought ought to be done. I didn't tell him I wanted it done. It wouldn't do any good to tell him what I wanted."

Further in his testimony witness says: "I never objected to the old dam in there, because it was doing no damage"; the objection being merely to raising the height of it. This was the dam as constructed when plaintiff became the owner of the premises.

Corliss testifies that plaintiff objected to raising the crib dam (meaning the one constructed in 1893 or 1894); that plaintiff thought, from the way it was constructed next to the bank, that, if they raised it, it would cut the bank out; that witness was somewhat interested, and that practically both he and the plaintiff objected; that witness gave his reason to show how the dam should be fixed. Further he testifies that he did not know that he objected to raising the dam, but gave his ideas as to protecting

the bank, and that about this there was some difference of opinion. It is further shown that the dam was so raised as to cause the water to overflow plaintiff's land at an appreciably greater depth than formerly, that its first construction at its present locality was at a large expense, and that the improvements since made have cost the company several thousand dollars. In 1892 an action was commenced by one Dixon against the power company, resulting in a judgment and sale of all its property and franchises to him, as the purchaser. He in due time obtained a sheriff's deed thereto, together with the improvements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining; the right to construct the dam across Rogue River and connect it with the south bank being especially specified as an item of the subject-matter of the grant. Dixon subsequently conveyed to the new company, the defendant herein, which was incorporated and organized about September 2, 1893. In conjunction with this title there is in the record a deed from the old company direct to Dixon, so that his title did not depend alone upon the sheriff's deed. The purpose of this suit is to require the removal of the dam, and for damages incurred by its maintenance at the present location. Failing of relief in the circuit court, the plaintiff appeals.

1. We have attempted to give a resume of such material and pertinent portions of the testimony as is deemed essential to a clear understanding of the dominant and controlling questions involved. The first arising is respecting the nature of the grant from Geyer to the power company. Plaintiff's counsel contends that it is a mere easement in gross, personal to the grantee, incapable of assignment, and that it did not pass to the defendant as the successor and grantee of the old company, while, upon the other hand, it is insisted that the easement is appurtenant to the defendant's plant, and the realty upon which it is situated and operated. Technically, an easement in fee must be appurtenant to land. It is an incorporeal right, which, as the term implies, is attached to and belongs to some greater or superior right—something annexed to another thing more worthy, which passes as incident to it. But an easement in gross, where the

grant is to the grantee, his successors and assigns, is capable of assignment, and is therefore in perpetuity, though not technically in fee: 10 Am. & Eng. Enc. Law (2 ed.), 403; *Houston* v. *Zahm,* 44 Or. 610 (76 Pac. 641, 65 L. R. A. 799); *Pinkum* v. *City of Eau Claire,* 81 Wis. 308 (51 N. W. 550). The difference is said to be purely technical, and does not affect any substantial right in the premises. The grant, nevertheless, will be construed in the light of the attendant circumstances and conditions under which it was made, and no presumption that it is in gross will be entertained when it can be fairly inferred that it was the intendment of the parties that it should be appurtenant to some other or dominant estate; and, in this view, it may become appurtenant to an estate of the grantee, if such was the purpose of the grant. So it was held in *Hopper* v. *Barnes,* 113 Cal. 636 (45 Pac. 874), quoting from the headnote: "A right of way granted to one and 'his heirs and assigns forever' will be held to be appurtenant to land of the grantee, though not so expressed in the deed, and not a grant in gross to the person of the grantee, when it leads to such land, and, except for use in connection with it, would be a useless cul-de-sac, and where it has, both before and since the grant, been used solely for access to such land."

So, also in *Poull* v. *Mockley,* 33 Wis. 482, where a grant of the right to take water for family and other purposes out of the well on the grantor's lot, and to use a road three feet wide from the east line of such lot to the well, was to the grantee, "his heirs and assigns"—the grantee at the time owning the lot adjoining that of the grantor on the east—it was held, first, that the easement should, perhaps, be regarded as appurtenant to the grantee's lot; and, second, that if the easement was not appurtenant, but in gross, yet that it was in perpetuity, and was assignable by the grantee, and that his grantee acquired his rights in the easement. In its reasoning, the court says: "We cannot see any substantial reason for holding that an easement in gross cannot be assigned or transferred, especially when the language of the grant shows unmistakably that the intention was that it should be enjoyed by the grantee, 'his heirs and assigns.' There is surely no ground for saying that Fuchs (the grantor) only intended to grant a

personal right to Budinger, and to restrict the right to take water from his well to him alone. Such an inference would be wholly unwarranted from the language of the grant. In this case the defendant has become the owner of lot 9, and he has likewise acquired from Budinger the easement, unless the rule of the common law prohibits grants of that character. We do not think there is any such inflexible principle, and consequently sustain the grant in the present case." Of a kindred nature are *Goodrich* v. *Burbank*, 12 Allen, 459 (90 Am. Dec. 161), and *Moll* v. *McCauly*, 83 Iowa, 677 (50 N. W. 216).

Now, the purposes of the present grant, which, upon its face, appears to be an easement in perpetuity, are very apparent. At the time the power company was the owner of land on the north side of Rogue River, was constructing a plant to be propelled by water to be taken from the river, and was engaged in the construction of a dam across the river, with the intention of diverting such water and utilizing it for power purposes; and, finding it necessary for the completion of the improvement that it should acquire a right to abut the dam to the south bank, together with the right to maintain it and to raise the water in the stream, it procured from Geyer, the owner of the lands upon the south bank of the river, the grant in question. Geyer, of course, knew the purpose of the grant, and that the easement was to be used in conjunction with the power house and the realty upon which it was being constructed; and, the grant being to the power company and "its successors and assigns forever," it must be deemed, in the light of the attendant conditions and circumstances, and the acts of the parties, both before and subsequent to the grant, to be appurtenant to the plant and the realty upon which it was being constructed, as the dominant estate. All the indicia attending the grant are inimical to the idea or presumption that it was in gross, and intended as merely personal to the grantee and unassignable; and, by the very strongest inference and rational deduction, it must be held to be a grant of an easement in fee, appurtenant to the grantee's estate.

2. The grant being an easement in fee, the deed was entitled to record, and, being recorded, subsequent grantees of the servient estate must be held to take with notice thereof.

3. Again, such being the character of the grant, the new power company has acquired the interest of the old company by virtue of the conveyances heretofore noted: *Bank* v. *Miller* (C. C.), 6 Fed. 545.

4. It is suggested that the old power company was without competent authority to assign or transfer its special privileges and franchise granted to it by the Town of Grants Pass, and therefore, that the defendant, the new power company, has not acquired such privileges and franchise by virtue of such conveyances. If such be the case—a matter which we do not decide, as it is not deemed a point in issue—the rule is not inimical to that other rule that an easement appurtenant will pass with a grant of the dominant estate, even without special mention of the easement in the grant. The easement acquired from Geyer was not a special privilege or franchise acquired from the government or municipality, within the purview of the rule that counsel seek to invoke and have applied.

5. The next question presented relates to the changing of the place of abutting the dam on the south bank of the stream; it being insisted by plaintiff's counsel that, having once selected the place and location, and actually located the south abutment approximately opposite the power company's plant, the company was without authority thereafter to replace the abutment at another location, notwithstanding necessity required it, and hence that it is without right or legal authority to maintain such abutment at the place where it now stands, or to maintain the dam in its present locality. The position would be incontrovertible, were it not for the fact that Geyer and his grantees, including the plaintiff, have by their acts impliedly, if not expressly, assented to the change in such manner that they are now estopped to assert to the contrary: *Jaqui* v. *Johnson,* 27 N. J. Eq. 526; *Marsh* v. *Haverhill Aqueduct Co.,* 134 Mass. 106. Geyer, the original owner of lots 5 and 6, when the easement was granted by him to the power company, continued to be the owner of the locus in

quo of the final termination of the dam on the south bank of
Rogue River, when the dam was relocated and reconstructed
about the years 1893 or 1894; and he made no objection to such
relocation or reconstruction, although he must have known of
the fact, and that the company was expending money in further-
ance of the project.  The company continued to use such dam as
so relocated and reconstructed for about six years or more, and
no one seems to have disputed or controverted its right to main-
tain the structure until it began to make some repairs about the
year 1900, when the plaintiff says he objected to such construc-
tion and maintenance.  His further examination, however, is
effective to develop the fact by clear deduction that the objection
was not to the maintenance of the dam or the abutment where
located, but to increasing its height, and to the manner in which
it was being tied to the bank, and to the lack of bank protection.
This, it seems to us, is tantamount to an assent to the mainte-
nance of the structure at the place where the present dam is
located; and not only did he not manifest his dissent to such
maintenance, but he suggested and advised with the officers and
employees of the company as to how and in what manner the abut-
ment should be constructed to protect the bank and make it
secure against the action of the water.

So, with Mr. Corliss, who was interested in the premises prior
to the plaintiff's acquiring title thereto, his objection was not to
the locus in quo, but to the manner of the maintenance of the
structure, and to the lack of protection to the bank against injury
by overflow.  Under these conditions, and with the tacit, if not
express, assent of the plaintiff, the company continued to expend
large sums of money in making the structure permanent and
substantial, and in a fair endeavor to protect the plaintiff from
harm from inundation.  And the plaintiff is now estopped to
insist that the dam or its south abutment should be removed.  As
was observed in *Boynton* v. *Ress,* 8 Pick. 329, 332 (19 Am. Dec.
326), "the change of its original position, acquiesced in by the
proprietors of the land, was justifiable, and will be presumed to
be in accordance with the intention of the parties to the convey-
ance."  In the present instance we must presume that it was in

accordance with the intention of the parties to the grant of the easement.

6. It is further insisted that the dam has been raised in height so as to overflow plaintiff's land to a depth greater than formerly, and that this should be inhibited. .The evidence probably sustains the contention as to the raising of the height of the dam, but the grant is so broad in its terms as to indicate clearly an intendment to confer the right so to do. It reads, after giving the right to construct, repair, rebuild, and maintain the dam, abutments, and cribs therein, thus:

"Together with the full, free right, liberty, and privilege forever to flow the waters of said Rogue River back upon and over the said land of the party of the first part at any and all times as a result and in consequence of said dam across said river without any damages or claim or demand for damages upon the part of the party of the first part, his heirs or assigns."

These terms are explicit, and do not in any way limit the company in constructing the dam to any height it might deem proper, in so far as the plaintiff is concerned.

There is some contention that the instrument does not correctly express the.agreement of the parties, and that its consummation was the result of fraud practiced upon the grantor. The complaint, however, does not make any mention of fraud in the premises, nor is it in any manner made the basis of recovery, so that inquiry concerning it is not germane to the issues under which the case was tried.

These considerations affirm the decree of the trial court, and such will be the order here.                          AFFIRMED.